Ranney, J.
At the present term of this court an alternative writ of mandamus was allowed and issued in this case, to which the defendants have now made return. The return is demurred to by the relator.
The question is, shall a peremptory mandamus issue ? The petition upon which the writ was allowed, shows that the petitioners were duly incorporated on the 4th of February, 1851, to construct a railroad from Cincinnati, by the way of Wilmington, in Clinton county, and other intermediate points, to the city of Zanesville, in Muskingum county, and that they have fully organized under their charter. That in pursuance of an act of the general assembly, passed March 1, 1851, to authorize the commissioners of Clinton county to subscribe to the capital stock of said company, the question of subscription was submitted to the qualified electors of the county at the April election in that year, and a majority obtained in favor of such subscription; all the provisions of the law in relation to notice, taking the vote, and certifying *the result, having been duly observed. That the commissioners did, in obedience to the act, afterward, on the 23d day of May, 1851, subscribe in the name, and for, and in behalf of said county, the sum of two hundred thousand dollars, to the cajiital stock of the company; the company, at the same time, in conformity with the proviso in the second section of said act, agreeing, in writing, to pay all interest which might accrue on the bonds, to be issued by the commissioners in payment of the subscription. .It further avers that, on the 4th of March, 1852, the commissioners then being in session, the company by their president applied to them to issue the bonds or obligations of the county in payment of the subscription, which they refused to do, or to comply in any manner with the provisions of said act. These allegations of the petition are all admitted by the defendants’ return, and, in conclusion, they say : “ These defendants, entertaining doubts in regard to the constitutionality of the *69 act of the general assembly under which said subscription of stock was made, and under which the issue of the bonds of the county is sought to be enforced, have hitherto declined to issue said bonds, and still decline so to do. Which refusal is placed solely upon the ground that the act in question is unwarranted by the constitution of the State of Ohio, and is therefore void.”
As all these proceedings were had, and the obligation of the county, if any, incurred by the subscription, before the taking effect of the present constitution of the state, no question can arise under its provisions. The sole question for our determination, therefore, is, was the act of March 1st, 1851, warranted by the constitution of 1802, then in force ?
This act differs in no important particular from a large number, passed by the general assembly of this state, for like purposes, within a few years past. It authorizes and requires the commissioners, with the consent of a majority of the voters of the county, to be expressed at the regular spring election of 1851, to subscribe to tho capital stock of the company an amount not exceeding $200,000, for the *payment of which they wore authorized to issue the bonds of the county for the amount, either directly to the company, or to borrow money upon, payable at such time as they should deem expedient, and at a rate of interest not exceeding seven per cent. But before any bonds were issued, the company was to agree in writing, to pay all interest that might accrue upon them, being entitled to receive the dividend from the1 stock, until they were redeemed ; for which the faith of the county, and the profits from the stock wore pledged; and the commissioners and auditor were required to levy such tax annually upon the property of the county as would meet any deficiency, and create a sinking fund of such amount as they deemed expedient. The commissioners were authorized to vote at the meetings of the company on the stock owned by the county, and to sell and transfer the stock to pay off the indebtedness, when they should deem it expedient.
Two townships were excluded from the right to vote, and also from the burthen incurred by the subscription.
The question thus presented is one of the very first importance, not only on account of the principles arising, but of the immense interests involved in its determination. Under these laws, bonds for many millions of dollars have already been issued, which have for the most part passed into the hands of bona fide holders. These *70 subscriptions by counties, cities, and towns, have induced subscriptions to a very large amount by individuals for works now inp rocess of construction, which must inevitably fail, with great individual loss, if they are not inforced ; on the other hand, the fact is not to be overlooked, that the indiscriminate prodigality with which grants of this kind have been made, is calculated to saddle the people of the state with a very heavy indebtedness, and in many instances to burden them with onerous taxation for many years to come. But these considerations, important as they must be conceded to bo, can have no further influence upon our inquiries than to induce very careful and mature investigation and deliberation. Aided *by the very elaborate and able arguments of counsel, we have endeavored so to consider the question, and have been enabled to arrive at a unanimous conclusion in favor of the constitutionality of the act in question, upon grounds entirely satisfactory to every member of the court.
The power and duty of the court, and the principles by which it should be guided in determining a question of this character, have been made the subject of much remark at the bar. It seems now, however, to be generally, if not universally conceded, that it is the right, and consequently the duty of the judicial tribunals to determine whether a legislative act, drawn in question in a suit pending before them, is opposed to the constitution of the United States, or of this state, and, if so found, to treat it as a nullity. How any doubt could ever have been entertained upon this subject, is matter of no little astonishment; and yet the history of our own state shows that the power was at one time not only doubted, but positively denied; and judges, for a fearless discharge of this duty, were subjected to impeachment by the house of representatives. The triumph of this great principle, vital to all constitutional government, must be attributed, in no small degree, to a clearer comprehension of the nature and purposes of fundamental laws, and the powers of the legislative body derived from them.
These laws, emanating directly from the fountain and source of all political power, serve not only to define the power, and as guides to the action of that body, but extend their protection, and to a groat extent apply their provisions to the rights and interests of every individual citizen, who has at all times a right to invoke that protection when these rights and interests are invaded, and may rightfully and truthfully insist that, to this extent, he is placed *71 above and beyond the power of the government, created by the constitution.
To adjudicate upon and protect these rights and interests, constitute the whole business of the judicial department. Each judge, before he is permitted to enter upon so important % duty, is required to bind his conscience by a solemn oath to support these constitutions. After all this, when he is clearly convinced their provisions have been violated, and the rights of the individual secured by them have been invaded by a legislative enactment, he has but one of two courses to pursue—either to regard his oath, vindicate the fundamental law, and protect the rights of the individual citizen, or to give effect to an act of usurped authority. In such case, it can not be doubtful where the path of duty leads. The latter alternative can only bo followed when we are to nullify all constitutional guaranties, and proclaim the legislative body, like the British Parliament, omnipotent. Por, as stated by Chief Justice Marshall in Marbury v. Madison, 1 Cranch, 137 : “ To what purpose are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained ? The distinction between a government with limited and unlimited powers is abolished, if those limits do not confine the persons on whom they are imposed, and if acts prohibited and acts allowed are of equal obligation.” “ The constitution is either a superior, paramount law, unchangeable by ordinary means, or it is on a level with ordinary legislative acts, and, like other acts, is alterable when the legislature shall please to alter it. If the former part of the alternative be true, then a legislative act contrary to the constitution is not law; if the latter part be true, then written constitutions are absurd attempts, on the part of the people, to limit a power in its own nature illimitable.”
But while the right and duty of interference in a proper case are thus undeniably clear, the principles by which a court should be guided in such an inquiry are equally clear, both upon principle and authority. It is never to be forgotten that the presumption is always in favor of the validity of the law; and it is only when manifest assumption of authority, and clear incompatibility between the constitution and the law appear, that the judicial power can refuse to *oxccute it. Such interference can never be permitted in a doubtful case. And this results from the very nature of the question involved in the inquiry.
*72 The legislature is, of necessity, in the first instance, to be the judge of its own constitutional powers. Its members act under an oath to support the constitution, and in every way under responsibilities as great as judicial officers. Their manifest duty is never to exercise a power of doubtful constitutionality. Doubt, in their case, as in that of the courts, should be conclusive against all affirmative action. This being their duty, we are bound, in all eases, to presume they have regarded it; and that they are clearly convinced of their power to pass a law before they put it in the statute book. If a court, in such case, were to annul the law while entertaining doubts upon the subject, it would present the absurdity of one department of the government overturning in doubt what another ‘had established in settled conviction, and to make the dubious constructions of the judiciary outweigh the fixed conclusions of the general assembly.
Theadjuded cases speak a uniform language upon this subject. The question was early brought to the attention of the supreme court of the United States. In Hylton v. The United States, 3 Dall. 171, Mr. Justice Chase declares, “ if the court have such power, I am free to declare that I will never exercise it but in a very clear ease ;” -and Mr. Justice Washington, in Cooper v. Telfair, 4 Dall. 14, says, “the presumption must always be in favor of the validity of the laws, if the contrary is not clearly demonstrated.
When it became necessary afterwards, in the case of Maybury v. Madison, to determine.the question of power, the court did not hesitate, as we have seen, to exercise it, and to annul the law; but still adhering to the doctrine announced in the early cases cited, we find Chief Justice Marshall, at a later period, in delivering the opinion of the court in Fletcher v. Peck, 8 Cranch, 87, declaring, “ it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers and its acts to *be considered void. The opposition between the constitution and the laws should be such, that'the judge feels a clear and strong conviction of their incompatibility with each other.”
An unbroken chain of decisions to the same effect is to bo found in the state courts. I shall refer to but few of them. In Adams v. Howe, 14 Mass. 345, the doctrine is thus stated: “ the legislature is, in the first instance, to be the judge of its'own constitutional powers, and it is only when manifest assumption of authority or misapprehension of it shall clearly appear, that the judicial power *73 will refuse to execute the law.” And, again, in Wellington v. Petitioners, etc., 16 Pick. 95, the same court announce theirdetermination, “ never to declare a statute void, unless the nullity and invalidity of the act are placed, in their judgment, beyond reasonable doubt.” The supreme court of Pennsylvania deny the powers of the courts to interfere to sot aside a law, unless the legistature have encroached on ground which they are positively or by necessary implication forbidden to enter. • 11 Penn. St. 70. And the court of appeal, in Kentucky, in the City of Louisville v. Hiatt, 2 Mon. 178, say, “if it be doubtful or questionable whether the legislative power has exceeded its limits, the judiciary can not interfere, though it may not be satisfied that the act is constitutional; ” and, again, in Lexington v. McQuillan’s heirs, 9 Dana, 514, “ wo should be justly chargeable with wandering from the appropriate sphere of the judicial department, where we, by subtle elaboration of abstract principles and metaphysical doubts and difficulties, to endeavor to show that such a power may be questionable, and on such unstable and injudicial ground to defy and overrule the public will, as clearly announced by the legislative organ.”
But the authority of the general assembly is .much too broadly stated, when it is claimed that all their acts must be regarded as valid, which are not expressly prohibited by the constitution. A moment’s attention to principles, which must be regarded as fundamental in all the American systems of government, will demonstrate the unsoundness of such a ^conclusion. One of these principles, lying at the very foundation of these systems, and expressly asserted in section 1, article 8, of the constitution of 1802, is, that all political power resides with the people—that government is founded “ on their sole authority, and organized for the great purpose of protecting their rights and liberties and securing their independence,”, and that “ they have at all times a complete power to alter, reform, or abolish their government, whenever they may deem it necessary.”
They have, therefore, the most undoubted right to delegate just as much, or just as little, of this political power with which they are invested as they see proper, and to such agents or departments of government as they see fit to designate. To the constitution we must look for tho manner and extent of this delegation ; and from that instrument alone must every department of the government derive its authority to exercise any portion of politi *74 cal power. That instrument is the letter of attorney, by which alone they are authorized to act at all, and, in all cases, they must be able to show that their acts are authorized by it. To prevent the enlargement of this grant of power by construction or otherwise, we find it declared, in section 28 of the same article, “ that all powers not hereby delegated remain with the people.”
The people have thus granted certain political powers, to be exercised for their benefit, until they see fit to resume them, and have retained others. On looking into the constitution we find the granted powers assigned to three great departments of government—the legislative power to the general assembly; the executive power to the governor; and-the judicial power to the courts. Unlike the constitution of the United States, and from the necessity of the case, no attempt at a specific enumeration of the items of legislative power is made. This must, therefore, always be determined from the nature of the power exercised. If it is found to fall within the general terms of the grant, we can only look to the other parts of the constitution for limitations upon it: if *none are there found, none exist. But, as the general assembly, like the other departments of government, exercises only delegated authority, it can not be doubted, that any act passed by it, not falling fairly within the scope of legislative power, is as clearly void as though expressly prohibited. And we agree entirely with the supreme court of Pennsylvania in Parker v. Commonwealth, 6 Barr. 511, that “ it is this species of insidious infraction that is more to be feared and guarded against than direct attacks upon any particular principle proclaimed as a part of the primordial law; for attempts of the latter description will generally be met by instant reprobation, while the stealthy and frequently seductive character of the former is apt to escape detection, until the innovation is made manifest by the infliction of some startling wrong.” It is not my purpose to point out the numerous cases in which a legislative act might be avoided as transcending the limits of the powers delegated to that body, although not expressly prohibited. The attempted exercise of executive or judicial power, delegated to the other departments, will very readily suggest many instances, while many others may be easily imagined, of encroachments upon reserved rights, not surrendered to any department of the government.
From these considerations, it follows that it is always legitimate *75 to insist that any legislative enactment, drawn in question, is void, either because it does not fall within the general grant of power to that body, or because it is expressly prohibited by some provision of the constitution.
And this brings us to the specific objections relied upon to show the act in question a nullity. They are: 1st. That the act was not passed into a law by the general assembly, but was made to depend for its effect upon a vote of the people of Clinton county ; and this involves an attempt on the part of that body to delegate legislative power. 2d. That the power exercised does not legitimately fall within the definition of legislative authority; and 3d. That the act is opposed *to certain express provisions of the constitution. We shall consider these positions in the order thus stated.
I. That the general assembly can not surrender any portion of the legislative authority with which it is invested, or authorize its exercise by any other person or body, is a proposition too clear for argument, and is denied by no one. This inability arises no less from the general principle applicable to every delegated power requiring knowledge, discretion, and rectitude, in its exercise, than from the positive provisions of the constitution itself. The people in whom it resided have voluntarily relinquished its exercise, and have positively ordained that it shall be vested in the general assembly. It can only be reclaimed by them, by an amendment or abolition of the constitution, for which they alone are competent. To allow the general assembly to cast it back upon them, would be to subvert the constitution and change its distribution of powers without their action or consent. The checks, balances, and safeguards of that instrument are intended no loss for the protection and safety of the minority, than the majority; hence, while it continues in force, every citizen has a right to demand that his civil conduct shall only be regulated by the associated wisdom, intelligence, and integrity of the whole representation of the state.
But while this is so plain as to be admitted, we think it equally undeniable, that the complete exercise of legislative power by the general assembly does not necessarily require the act to so apply its provisions to the subject-matter as to compel their employment without the intervening assent of other persons, or to prevent their taking effect only upon the performance of conditions expressed in the law.
Indeed, the whole body of our legislation, as well as that of every *76 other state, is divided between laws which imperatively command or prohibit the performance of acts, and those which only authorize or permit them. Time and space would both fail me to refer in detail to all of those of the latter description. A few, however, will serve to illustrate the whole. The county commissioners, in each county, are *authorized, but not required to erect public buildings, and to erect and establish poor houses in their respective counties, and to levy taxes for these purposes. In these cases, with many others that might be mentioned, the discretion is vested in the county commissioners.
The school laws of this state have always allowed the householders and resident tax-payers of the school districts to determine by vote upon the erection of school-houses, and the imposition of the necessary taxes for the purpose; and a more recent law for the establishment of schools of a higher grade in cities and towns, has left to the electors of each town and city, respectively, the right to determine whether they should be put into operation within the limits of each. Of the same character is the law which leaves to the citizens of each township to decide upon the erection of a town house, while every act of incorporation ever passed necessarily refers the question of its acceptance to the corporators ; these all present cases where the discretion is left to the body of those interested, or to be affected.
But because such discretion is given, are these and all similar enactments to be deemed imperfect and nugatory? It. would take a bold man to affirm it. In what does this discretion consist? Certainly not in fixing the terms and conditions upon which the act may be performed, or the obligations thereupon attaching. These are irrevocably prescribed by the legislature, and whenever called into operation, conclusively govern every step taken. The law is therefore, perfect, final, and decisive in all its parts, and the discretion given only relates to its execution. It may be employed- or not employed ; if employed, it rules throughout; if not employed, it still remains the law, ready to be applied whenever the preliminary condition is performed. The true distinction, therefore, is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring an authority or discretion as to its execution, to be exercised under and in pursuance of the *law. ’ The first can not be done; to the latter no valid objection can be made.
*77 The act under consideration is mandatory in some of its provisions and leaves a discretion in others. It commands the vote to be taken, and if the subscription is made, it imperatively directs all the subsequent proceedings. But it submits to the discretion of the voters of Clinton county, who are chiefly interested and to bear the burden, if assumed, whether the subscription shall be made—• and the law thus fully executed. But this power of deciding upon its execution so far from being contradictory to or inconsistent with the act, is the condition prescribed by the law-making power itself, upon which alone it is permitted to have effect. It is not the vote that makes, alters, or even approves the law, but, as well remarked by one of the counsel, it is the law that makes the vote and prescribes everything to be done consequent upon it.
But it has been claimed that a county is incapable of receiving such a power or executing such a duty. This position is based upon the assumption that counties can constitutionally be authorized to exercise such powers only as have belonged to them by immemorial usage. I am not aware of any provision of the constitution governing this case, which prescribes for what purposes they may be employed. But what is a county ? It is not imperium in imperio, in any sense. It is invested as such with no single attribute of sovereignty, and, for reasons already stated, it can not be. Bightly considered, it is a mere instrumentality, a means in the hands of the legislative power to accomplish its lawful purposes; and to this extent a creature in the hands'of its creator, subject to be molded and fashioned as the ever-varying exigencies of the state may require. It would seem to follow that it may, from time to time, be clothed with such powers, and charged with such duties of a local administrative character, not vested elsewhere by the constitution, as the general assembly may see fit to direct. And so they have always been treated and used. Scarcely a year of our legislative history has passed which has not added to and taken from them ^powers and duties of this character. The legislature might perform their duties directly, but, for the most obvious reasons, could not as understandingly and efficiently do it, as by the employment of those subordinate agencies. Whether the act in question confers powers and duties of the character above indicated, or such as the legislature had power to confer, belongs to another part of this inquiry.
These views lead to the conclusion that an enactment is not ini *78 perfect which makes its execution depend upon the contingent approval of persons designated in it, and that a county organization may be clothed with this discretion; and if the commissioners, the agents of the County, may exercise it, it seems too clear to be doubted that it may be conferred upon the body of those they represent.
We are therefore of the opinion that the act in question does not delegate legislative power, or contravene the constitution in providing that the subscription should not be made until the assent of a majority of the electors of Clinton county was first obtained; and we know of no adjudged case that conflicts with the views we have expressed, or the conclusion to which we have arrived. The case of Rice v. Foster, 4 Harr. 479, decided by the court of appeals of Delaware, in June, 1847, and of Parker v. The Commonwealth, 6 Barr, 507, by the supreme court of Pennsylvania a few months later, are very strongly relied upon by the defendant’s counsel. We have very carefully considered these eases, and although the question presented was not free from difficulty, as is manifest from the nearly equal division of the later court, we are of opinion they were rightly decided. The facts in each ease were the same. Existing laws in each state provided for granting licenses to tavern-keepers and retailers of spirituous liquors. The acts in question, and which were held invalid, submitted to the voters of each township to decide whether licenses should continue to be granted in such township; and if decided against, the sale was made criminal. This, in effect, submitted the question whether the license laws should be repealed and a criminal *prohibition take their place. To repeal a law requires the same exercise of power as to enact it; and the one can no more be delegated than the other. The voters in these cases were not called upon to determine upon the execution of a law under and in conformity to its provisions, but whether the law itself should continue to exist. That this was the view taken and that they did not intend to press the doctrine to the extent now claimed, is most manifest from the opinions delivered, and especially from the latter decisions of the Pennsylvania court. In the Delaware case, in answer to the arguments drawn from the school laws, and after citing many instances of good conditional laws, the Chief Justice says: “A law altering, abridging, or enlarging the vested powers of corporations aggregate, subject to the consent of said corporation, or a law giving to school dis *79 tricts a portion of the school fund on condition that such districts will raise an equivalent or proportional sum, are all instances of proper conditional legislation, even though' the assent of the corporators in the one case to the change of their charter, or of the district, in the other, to accept the donation and comply with its terms, should be signified by a majority vote. These are all good conditions, capable of being performed without in any way interfering with the legislative will. But a law declaring an offense, or providing a punishment, or repealing an existing law on condition that the governor or any other individual shall assent to it, is as plainly unconstitutional. It is the naked veto power.”
And, again: “ To say that the authority given to the school voters, the members of a corporation to determine whether a tax shall be laid or not, is a grant of legislative power, is an abuse of language. Legislative power is the power of making laws. The making of a law, prescribing by what persons, or by what body, when, and in what manner taxes should be laid and collected, is the exercise of a legislative power. But the making of a resolution or order, or the determination or direction by the persons or body appointed for such purpose by the law, that taxes shall be laid and *collected, is simply the execution of an authority granted by statute.”
In answer to a similar argument in Parker’s case, it is said: “ But here an obvious distinction is to be observed. A law designating the persons, or bodies of persons, by whom a tax may be imposed, and the mode in which it shall be collected and distributed, requires the authority of the constitutional law-maker, for it is a rule of action prescribed. But the act of the designated persons or bodies depends, for its authority, altogether upon the law commanding or permitting it.”
“ Of the illustrations furnished by our statute book of this distinction, may be mentioned the laws empowering county commissioners and supervisors of townships to assess and levy taxes for county and township purposes respectively. In these cases deliberation, judgment and discretion are to be employed, and there are many facts to be determined, but the right to determine is derived from the statute. But this is a very different right from that sought to be drawn from a concession of power to enact a penal statute, under which the citizen may be indicted and punished.”
This ease subsequently came under review in the case of The Commonwealth v. The Judges'of the Court of Quarter Sessions, 8 *80 Barr, 391, and Commonwealth v. Painter et al., 10 Barr, 214, in each of which it was claimed that the principle settled in Common- ' wealth v. Parker would annul the law, and in each the claim was disallowed. The first arose under a law submitting to the voters of a township, which had been divided, the question whether the new township should be continued or be annulled. The voting having resulted adversely to its continuance, it was claimed the act involved a delegation of legislative power, as settled in Parker’s case. . To this the same judge who delivered that opinion replies : “ This opinion is founded in an entire misapprehension of the doctrine of that case. That the erection of a township, or the creation of a new district for merely municipal purposes, or convenience in the ^transaction of the public business, is in no degree similar to the exercise of the law-making power. The one is an exercise of sovereignty, the other in its very nature a subordinate function. The latter, like the laying out of a public road or highway, or the erection of a bridge, may require the exercise of judgment and skill; but there is nothing either in the positive provisions of our constitution or the genius of our institutions which prohibits the action of other than legislative bodies.”
And to the further objection that the act conferred the power upon the electors, instead of a judicial court, it is said : “But if the legislature can authorize the courts to decide questions of this character, they can also authorize the people primarily to do so. The difficulty is simply in the right to impart the power to act. If it can be given to a selected few it may also be delegated to all the inhabitants of a district, unless positively prohibited.”
In the last case cited, the law submitted to the electors of a county the question of the removal of the county seat. The law was held valid, and the question considered to be settled by the case in 8 Barr.
I have been thus particular in noticing the decisions of these two courts, because their authority is solely relied upon by the defendant’s counsel. Fairly considered, they contain nothing opposed, but much in affirmance of the views we have expressed. I can only refer to the decisions of other courts of equal respectability in point, to sustain the positions we have taken.
In the case of the State on relation to Caldwell v. Reynolds, 5 Gilman, 1, a law providing for the division of a county and the formation of a new county from the same territory, to take effect only *81 upon receiving a majority vote, was sustained by the supreme court of Illinois, in a very clear and forcible opinion. The very question now under consideration was decided in favor of the law, by the court of appeals in Kentucky, in the case of Talbot v. Dent, 9 B. Mon. 526, and affirmed by the same court in Slack v. *The Maysville and Lexington Railroad Co., decided in 1851. In this case, Judge Marshall, delivering the opinion, says: “ It is not essential to the character and force of a law, that the legislative enactment should itself command to be done every thing for which it provides. The legislative power to command a particular thing to be done includes the power to authorize it to be done. The act done under authority conferred by the legislature is precisely as legal and valid as if done in obedience to a legislative command.”
“ So far as such a statute confers authority and discretion, it is as obligatory from the first as the legislative power can make it; and although its further practical efficiency may depend upon the discretionary act of some other body or individual, it is not derived from that discretion, but from the will of the legislature which authorized the act, and prescribed its consequences.”
II. Does the object proposed by this law, and the method adopted for its accomplishment, fall within the legitimate scope of legislative authority? Its object and effect may be defined to be an authority to the county of Clinton to aid in the construction of a railroad passing through it, by subscribing to the stock.
We shall take for granted, as a predicate upon which to found all reasoning upon this subject, that the state may lawfully construct roads, canals, and other descriptions of internal improvement, calculated to facilitate the social and business intercourse of the. people, and to develop its resources and add to its strength and security.
However theorists may have assigned to government a more restricted sphere of action, it is certain that this power, like the power of establishing and supporting schools, and providing for the poor, insane, and unfortunate, presenting it in its more beneficent aspect, has always been exercised by every civilized state, and must bo held to be included in the general delegation of power in our own. If we needed confirmation of this, it would be found upon almost every page of our legislative and judicial history; while near twenty millions *of existing indebtedness, in addition *82 to the many millions already paid, incurred for these objects, would remind us of its constant and continued exercise.
It is true that in early times only wagon and turnpike roads were constructed; but it would be strange imbecility to fasten upon government, to deny it, in the attainment of the same ends, the use of such improvements as science and discovery have brought within its roach.
In accomplishing the lawful purposes of legislation, it must be admitted that the choice of mea¡us adapted to the end proposed, and not prohibited by the constitution, must be left exclusively to the discretion of the legislative body. And, unless we are prepared to overthrow the practice of the state and its judicial affirmance for half a century, it must bo further admitted that the incorporation of private companies for the construction of works of a public character is one of the lawful means that may be .employed. It is upon this principle, and this alone, that they have always been invested with the power to exercise the right of eminent domain by taking the necessary ground upon which to construct these works. This right has never been questioned, except as to the terms of compensation upon which it might be used; and, after so long an experience, the people have expressed their approval of it, in the adoption of the present constitution, which confers it expressly, under, however, most important safeguards for the correction of abuses which had grown up.
If, then, the general assembly may lawfully embark the state in the construction of these works, and, especially, if it may authorize private companies to construct”them, and they still retain their public character, it would seem to follow, for much stronger reasons, that it might authorize the counties to construct those of a local character, having especial relation to their business and interests. These political organizations are created for no private object. They are, as we have seen, public instrumentalities, invested with such local administrative functions as the legislature see fit, from *time to time, to confer upon them; and having the power to provide for the construction of such work directly and absolutely, it is most unquestionable that it has the power to attain the same end indirectly and conditionally through these subordinate agencies.
And such has been the constant course of our legislation. Prom an early period the whole power of laying out, establishing, and *83 keeping in repair, by a local tax, the public roads, has been confided to the several counties. For this purpose they have taken private property and levied taxes, and the power to do so has never been questioned by any one.
But it is insisted that the method adopted by the law, of subscribing to the stock of a corporation created to construct the road, is unwarranted and illegal—that the public can only be taxed for the construction of works which, when completed, belong exclusively to the public; and that to hold otherwise is to make the property of the citizen liable to be taken and taxed for .any private enterprise whatever, and to compel him, willing or unwilling, to become a member of a private corporation. The inference drawn in the argument thus stated, is altogether unwarranted. It is only such works of a public character as the state itself might make, or authorize the counties to make, that can be aided by subscribing to the stock of a corporation ; nor does the citizen in any manner become a member of the corporation. Where the right of eminent domain stops, there the right to incur any obligation for the public stops. But in its just application to this and like eases, as a question of expediency, the argument is entitled to much weight. It is not, however, expediency, but constitutional power, with which we have to deal. The latter consideration only has been entrusted to us, while the former belongs exclusively to the legislature.
This objection has a much wider application than might be at first supposed. Millions of the debt of the state has been contracted in this very manner, by subscribing to the stock of turnpike, railroad and canal companies. Are *these debts all void, and the interest of the state in these works lost ? Such would be the unavoidable consequence of giving effect to this objection ; for, as we have already settled, whatever method the state may lawfully adopt, it may authorize the counties to adopt, to attain the same end. But the position is untenable upon principle. The state might construct, or authorize the counties to construct these works entire ; or it might create corporations to do it entire. This would be adopting different, but lawful means to effect the same lawful object. If, then, either might do the whole, is it not too obvious for doubt, as a question of power, that each may be authorized to do a part ? Does not the whole necessarily include the parts, or can the exercise of a power be impeached, because it is not exercised to the full extent authorized? And may not different, but harmonious *84 agencies be employed, at the discretion of the legislature, to effect the object? We think they may. It is very true that the whole pecuniary interest of the work does not belong’ to the public when completed. But it belongs to them in exact proportion to the amount they have contributed to its construction, which is all that justice requires, and all that they have seen fit to exact.
While this question seems to us clear upon principle, we find ourselves confirmed in the conclusion to which we have arrived, by the unanimous opinions of all the state courts in which it has arisen. The case of Bridgeport v. The Housatonic Railroad, 15 Conn., 475, was decided by the superior court of that state, under a law conferring upon the city of Bridgeport the power to subscribe one hundred thousand dollars to the capital stock of the defendant, and to pledge the credit of the city therefor. This law was claimed to be unconstitutional, but the court sustained it, and held that it empowered the city to issue its bonds for stock in the road and inforeed their collection.
The case of Commonwealth v. McWilliams, 11 Penn. St. 61, arose under a law of that state, conferring upon the trustees of certain townships the power to subscribe, on behalf of their townships, to the capital stock of a turnpike company. Franklin township made the subscription, and levied a tax to pay it, which was resisted upon the ground that the act was unconstitutional. The court overruled the objection and inforeed the tax. In the course of the opinion, and after founding the right to make the subscription upon the power of maintaining ordinary roads, it is said : “ A. very signal instance of the exercise of a similar power is afforded by the recent act of the 27th of March, 1848, authorizing the city of Philadelphia, the county of Alleghany, the cities of Pittsburgh and Alleghany, and the municipal corpprations of Philadelphia county, to subscribe for shares of the capital stock of the Pennsylvania Railroad Company, to borrow money to pay therefor, and to pay the principal and interest of the sum so borrowed. The exercise of this authority may, of course, entail additional taxation on the'inhabitants of the several places designated. Yet, though bebof'oro the enactment, the right of a municipal corporation to subscribe to the stock was strongly contested, no one has doubted it since, and on the faith of this legislation, millions of dollars have been subscribed.”
The question arose in the state of Virginia, and was decided by *85 the court of appeals, after a very able discussion at the bar, in the case of Goodin v. Crump, 8 Leigh, 120. The city of Richmond, under authority from the legislature, had subscribed to the stock of the James River and Kanawha Company, incorporated for the purpose of uniting the navigable waters of James river with the Ohio by a canal or railroad. A tax being levied to pay the interest, Goodin filed his bill to enjoin its collection. The court dismissed the bill, and affirmed the power of the legislature to enlarge the corporate powers of the city, with the assent of a majority, so as to enable it to incur this obligation, and bind the minority. In answer to the objection that the work was not confined to the corporate limits, and after stating the true test of the corporate character of the act to be the interest of the Corporation, and not whether the work is wholly within it, it is said: “ If then, the test of the corporate character of the act is the probable benefit of it to the community within the corporation, who is the proper judge whether a proposed measure is likely to conduce to the public interest of the city? Is it this court, whose avocations little fit it for such inquiries ? Or is it the mass of the people themselves—the majority of the corporation acting (as they must do if they act at all) under the sanction of the legislative body ? The latter, assuredly.”
In Tennessee, a law authorizing the city of Nashville to subscribe to the capital stock of a railroad company, was sustained by the supreme court of that state, in Nicol v. Mayor and Aldermen of Nashville, 9 Hump. 252.
The subject has several times been before the court of appeals in Kentucky, where it has been very thoroughly investigated, and treated with great ability.
Talbott v. Dent, 9 B. Mon. 526, was an action of replevin to try the validity of a tax levied to pay a subscription made by the city of Louisville to the stock of the Louisville and Frankfort Railroad Company, in pursuance of air act of the legislature, with the assent of a majority of the qualified voters of the city. The court held that the legislature had constitutional authority to grant to town or city corporations the power to tax for the construction of works of internal improvement, by which the facility of access to, and transportation to and from them, was promoted ; and that a railroad was such a work. After citing the authorities in support of this position, Chief Justice Marshall remarks :
“ These cases decide what must, we think, be conceded, that, in *86 order to characterize a particular work or expenditure as being within the legitimate local purposes of a local municipal corporation, it is not necessary that the work or expenditure should be confined to the local limits of the corporation ; but that in the case of a road or canal leading to or near the city, and obviously tending to facilitate its commerce, and secure or increase its commercial business *and prosperity, as well as the case of an aqueduct or sewer tending to promote the health and comfort of the city, it is sufficient that the object to be accomplished be so connected with the city and its interests, as to conduce obviously and in a special manner to their prosperity and advancement.”
The principles of this case were also affirmed at the same term, in Cheeney v. Hoover, 9 B. Mon. 250.
The whole subject came again under review in the very recent case of Slack et al. v. The Maysville and Lexington Railroad Co., already referred to for another purpose. The case ip volved the validity of an act of the legislature, under which the county of Mason, in pursuance of a majority vote of the qualified electors, had subscribed $150,000 to the stock of that company. The court affirmed the previous decisions, and sustained the law. Upon the questions whether the road was an object of such a character as the legislature might constitutionally' authorize or require a tax upon the counties through which it passed, or whether the tax should be local or general, or was equally laid, they regarded as belonging in a peculiar manner, as questions of fact and opinion, to the legislative department, which could alone exercise that power, and subject to no control by the judiciary, unless under color of the taxing power, it was really and substantially a taking of private property without compensation. That “ perfect equality of taxation is unattainable, and could not be secured even if the judiciary were to take part in framing the laws which impose it; and the other points above referred to are so emphatically and exclusively the subjects of legislative judgment and discretion, that when it may be assumed that these have been fairly or actually exercised, in the imposition of a tax, there can scarcely be a possible ground for judicial interposition.
It thus appears that subscriptions provided for in the act under consideration, made by townships, cities, and counties, have all been sustained by highly respectable judicial tribunals as often as the question has arisen. "Without a single adjudged case *87 to the contrary, we ought certainly to be able *to give very good reasons before coining to a contrary conclusion. Such reasons, we apprehend, do not exist. The state had unlimited power to construct improvements of this character ; and the selection of means and agencies to be employed for the purpose was left exclusively to the general assembly. Counties and private corporations might lawfully be employed as such means and agencies, and invested with such powers as were necessary to accomplish the object. Either might be authorized to construct such a work entire; but, being consistent and harmonious, both might be used, as in this instance, to effect the same object; the work, when constructed,being public in its character and purposes.
III. It is next contended that this act violates art. 8, see. 4, of the constitution, which provides: “Private property ought and shall over be held inviolate, but always subservient to the public welfare, pi’ovided a compensation in money be made to the owner.”
It is certain that it contemplates a contingent necessity of resorting to contributions from the property-holders of the county to discharge the obligation incurred ; and equally certain that it does not provide any pecuniary equivalent for such contributions.
If, therefore, this section has any application, the objection is well taken. To settle this point, it is necessary to determine which of two rights are called into exercise—the right of eminent domain, or the right of taxation. These rights, with which every government is necessarily invested, rest' upon the same foundation, and are in many respects alike, while in others they are very clearly distinguishable. They are both rights which the people collectively, either expressly or impliedly, retain over the property of individuals to take so much as may be necessary to enable government to accomplish its lawful purposes ; and the remarks of Chief Justice Marshall in Providence Bank v. Billings, 4 Pet. 514, are equally applicable to both, when he says: “ The power of legislation, and consequently of taxation, operates upon all the persons and property belonging to the body politic. *This is an original principle which has its foundation in society itself. It is granted by all for the benefit of all. It resides in the government as a part of itself, and need not he reserved when property of any description, or the right to use it in any manner is granted to individuals or corporate bodies.”
But neither can be classed among the independent powers of *88 government, or included in its objects or ends. No government was ever created for the purpose of taking, taxing, or otherwise interfering with the private property of its citizens. But charged with the accomplishment of great objects, necessary to the safety and prosperity of the people, these rights attach as incidents to those objects and become indispensable means to the attainment of those ends. They can only be called into being to attend the independent powers, and can never be exercised without an existing necessity. If, therefore, property is taken, or a tax levied without the existence of some legal and clearly defined purpose to which to apply it, there can be no doubt it would involve a usurpation of authority, which would render either illegal.
These rights are alike in another particular. While in each private property is taken, in each compensation is made. But here the parallel ends: the indispensable condition fixed by the constitution to the exercise of the right of eminent domain, is that the compensation be made in money; while the compensation secured to the individual for property taken by taxation consists in the protection which the government affords to his interests, and the increased value of his property arising from the use to which the government applies the money raised by the tax.
The distinctions and the reasons for them in the exercise of these two rights, is thus clearly and forcibly stated by Judge Ruggles in delivering the opinion of the New York court of appeals in the case of The People v. Mayor, etc., of Brooklyn, 4 Comst. 423:
“Taxation exacts money, or services, from individuals, as *and for their respective shares of contribution to any public burden. Private property taken for public use by right of eminent domain, is taken not as the owner’s share of contribution to a public burden, but as so much beyond his share. Special compensation is therefore to be made in the latter case, because the government is a debtor for the property so taken; but not in the former, because the payment of taxes is a duty, and creates no obligation to repay, otherwise than in the proper application of the tux. '
“ Taxation operates upon a communhy, or upon a class of persons in a community, and by some rule of apportionment.
“The exercise of the right of eminent domain operates upon an individual, and without reference to the amount or value exacted from any other individual or class of individuals.”
*89 With these considerations in view, there is no difficulty in seeing that it is the right of taxation, really and substantially, and not ' merely colorably, which is authorized to be exercised by this law, and that the constitutional provision referred to has no application to the case. On referring to the constitution of 1802, but a single express limitation upon the right of taxation is found. Article 8, section 23, affirms : “ That the levying of taxes by poll is grievous and oppressive; therefore the legislature shall never levy a poll tax for county or state purposes.” This only confines the legislature to the just principle of laying the public burdens upon property instead of persons.
It is not pretended that this provision has been invaded; beyond •this, and within the limits already indicated for the application of money raised, the power has no definite boundaries. As stated by Chief Justice Marshall in McCulloch v. Maryland, 4 Wheat. 428: “The only security against the abuse of this power is found in the structure of the government itself. In imposing a tax, the government acts upon its constituents. This is in general a sufficient security against erroneous and oppressive taxation. The people of a state, therefore, give to their government the right of taxing themselves and their property; and as the exigencies *of the government can not be limited, they prescribe no limits to the exercise of this right, resting confidently on the interest of the legislature and the influence of the constituents over their representatives to guard them against its abuse.”
Now, we have already settled that this was a work of such public character as the legislature might lawfully accomplish, either in whole or in part, under the general grant of power to that body, or might authorize a county to do the same; that this might be done by any means not prohibited, adapted to the end in view; that a subscription of stock to a Company incorporated for the purpose was not objectionable. If the obligation might thus be lawfully incurred by a county, it would seem to be too plain for a moment’s hesitation that the necessary means might bo raised by taxation to liquidate it. To the objection that this tax should bo general and not local, inasmuch as the work was not confined to the local jurisdiction, it ought to be sufficient to refer to the cases we have already cited, in each of which the objection lay with the same force as in this. As a general rule, those who receive tho benefit should bear the burden. If the benefit is general, the tax *90 should be general; if otherwise, local. But who should settle this question ? The general assembly, clothed with the most ample discretion, with the assent of the locality to be taxed, or this court, invested with no discretion whatever ? The general assembly and the people of Clinton county, upon full information, as is to be presumed, have decided it. How it is expected that we, without either the means of information or the power, should reverse that decision, we are unable to comprehend. We conclude with the Yirginia court, that “without entering into the inquiry whether the subscription was for their benefit or not, that they were the proper judges, subject nevertheless to that control which necessarily exists in the charter granting the power.”
As a consequence, the tax provided by this law is not beyond the legitimate scope of local, municipal taxation authorized to be employed by that constitution, nor opposed to *any provision in it. And while experience has fully demonstrated the necessity of further limitations upon the exercise of aright so liable to abus'e, and while we are all of opinion that laws of this character involve a gross abuse of right, for reasons which have led to their prohibition in the present constitution, and which need not be repeated, yet this court possesses no power to interpolate such limitations, or exercise a veto power upon such legislation.
This subscription having been made with the assent of a majority of the electors of Clinton county, and the county having thereby become absolutely bound by contract, before the adoption of the present constitution, and the commissioners, in pursuance of the law, having elected to deliver the bonds of the county to the company, in payment of the subscription; and afterwards, upon demand, refusing to do so, and showing no cause for such refusal, except that the law was of doubtful constitutionality ; we are of opinion that a writ of mandamus is the proper remedy to enforce the delivery.
It is now too well settled to require a reference to authorities, that this writ lies in all cases where the relator has a clear legal right to the performance of some official or corporate act by a public officer or corporation, and no other adequate specific remedy.

Peremptory mandamus awarded.