The Chief Justice

delivered the Opinion of the Court.
This is an agreed case, between the city of Lexington and the heirs of Thomas McQuillan, deceased, exhibiting in substance the following facts:—
Under the supposed authority of the eleventh section of the statute incorporating the city, the municipal council having, in the year 1836, graded and McAdamised Main Cross street, from the intersection of High street to Maxwell street, and also reduced to a corresponding grade and paved the side walks—distributed the cost thereof among the owners of lots on each of the squares opposite to and adjoining the improvement thus made; and McQuillan’s heirs being the owners of the lot on the corner of Main and High streets, fronting 177 feet on the former, and 66 feet on the latter, and estimated, in that year, at one thousand dollars—the city coucil assessed against them, as their distributive portion of the cost of the work, five hundred and nine dollars ninety two cents; that being one half of the amount charged for the grading and paving opposite to their ground.
This sum greatly exceeded the proportionate cost of the entire work done opposite to the lots of ground respectively in the same square, in consequence of a deep cut and a stone wall made opposite to the lot of McQuillan’s heirs.
The city collector, who was charged with the collection of the assessment, being about to coerce payment by a sale of the lot, in virtue of another ordinance prescribing such a procedure, the heirs resisted the sale, on the ground that they deemed the authority attempted to be conferred by the said eleventh section of the city charier, unconstitutional and void; and the foregoing facts and others not very material to the question of power *514 having been submitted by mutual agreement to the Circuit Judge of Fayette, he decided that the city had no-constitutional authority to exact the assessment as made, and thereupon enjoined the corporation from ‘‘ proceeding “to levy the sum in the agreed case mentioned, on the “estate of McQuillan’s heirs; or in any wise carrying “into effect the order for paving and grading the street ‘‘in the agreed case mentioned, or any part thereof, at the “cost of said heirs.”
Construction of the 11 sec. of the act to incorporate the city of Lexington,—by which power is given to the mayor and councilmen to have the streets and alleys paved or turnpiked ‘at the costand expense of the Iot-owners fronting such streets or alleys’—the cost and expense of improving that portion of a street upon which a lot fronts, cannot be assessed exclusively upon that particular lot.—The expenses are to be defrayed by squares. When any street or alley is to be improved, the cost within a square, is to be assessed upon the owners of all the lots with in that square, fronting on the street or alley to be improved—on each, in an equal ratio—not according to the value of the lots, but according to their extent upon the street or alley. And,if more than at that ratio, be assessed on the owner of any lot—as where half the cost of grading and paving a street against a lot, being much, more than the average for the square, was assessed upon the owner of it—a court of eq. may enjoin the collection of the assessment.
*514 That decision is now to be revised by this Court.
The eleventh section of the charter is as follows:—
“Seo. 11. Be it further enacted, That the mayor and “councihnen shall have full power and authority, to cause “and procure all the streets and alleys in said City, now “established, or hereafter to be established, to be paved “or turnpiked, at the cost and expense of the lot-owners “fronting such streets or alleys; and a petition in wri- “ ting, of the owner or owners of a greater part of the “ground fronting on any square, shall be sufficient to “authorize a contract for the paving or turnpiking the “street or alleys in such square: Provided, however, that “the mayor and councilmen, by their unanimous consent ‘‘in council, may cause any street or alley, in any square "in said city, to be paved or turnpiked at the cost and “expense of the owners of lots, or parts- of lots, fronting “such street or alley, without any petition or consent, ‘£ and when the paving or turnpiking shall be completed, “they shall apportion the costs and expenses equally, on “the lot-holders, and a lien is hereby given on the lots, “ and parts of lots, for the same; which costs and expenses may be listed and collected, as other taxes, by the ‘ ‘ City collector, and who shall have authority to sell and “convey the lots, and parts of lots, for the same, under ‘1 the by-laws and regulations of the mayor and council- ‘ ‘ men: Provided also, however, that the owner of any ‘ ‘ lot, or part of a lot, sold for paving or turnpiking, who ‘£ has not consented in writing, for that purpose, shall “have five years to redeem- the same, on paying the “purchase money, with ten ¡ser eentum interest per an- “ num, with all the taxes and levies that may have subse“quently accrued; and those who have consented in *515 “ writing, may redeem it, any time within one year, on ‘‘ the payment of the like interest: Provided, that infants “shall have one year after arriving at full age, on like “terms.”
It is manifest that this enactment prescribes a distribution of the entire cost of grading and paving a street and side walks, to the whole extent of the square, among the owners of the ground in that square, according to some principle of equity; and that it did not intend to authorize the exaction, from any such proprietor, of the cost of construction opposite to and co-extensively with the front of his lot, when the cost of that portion of the work had exceeded the average charge upon the entire square.
And it seems to us, also, that the rule of equality prescribed by the Legislature, is the territorial extent, and not the value of each lot of ground. This is the test of the authority given to a portion of the owners of ground in any one square, to require the renovation of the street and side walks opposite to such square, at the cost of all the owners of ground in it.
Had the ad valorem principle been adopted, the owner of a comparatively small piece of ground expensively improved might control the other owners of ground in the same square, and impose on the majority a heavy burden against their consent, and possibly against their interest. And, as the extent of each proprietor’s front on the street, is the criterion of authority given to a part of them to control the whole, and impose a common burden, it is altogether reasonable to infer that the aggregate responsibility should be, and was intended to be, distributed according to the same principle.
Then as the amount assessed against McQuillan’s heirs, is admitted to be much greater than their portion of the cost of the work opposite to the entire square, distributed among the several owners of ground therein, according to the rule prescribed by the statute, the Circuit Judge did not err in enjoining the coercive collection of the assessment, as thus illegally made, and attempted to be exacted.
But, nevertheless, if those heirs be legally liable, un *516 der the eleventh section, for any portion of the cost of the work, the Circuit Judge erred in enjoining the city from exacting from them any more than their ordinary rate of taxation, as owners of property in Lexington.
The authority of the Legislature to establish municipal corporations, and to delegate local powers to them, is not denied or doubted; but no greater power can be delegated, than might be exercised by the Legislature itself.
The legislative authority over this subject, tho’ extensive, is not altogether arbitrary, but is subject to certain limitations & restrictions among the most conspicuous of which, are the constitutional provisions which guaranty equality, as far as it is attainable, & the security of property from irresponsible power, and which require that taxation shall be general and uniform. There may be discrimination in the subjects of taxation; but there must be uniformity in the tax, upon the selected subjects; no individual’s property can be subjected to a heavier tax than others are required to pay on property of the same description, and no one can be exempt, but in consideration of public services. The imposition of a public burden in which these principles are departed from, is not properly the levying of a tax, but the taking of private property for public use, contrary to an express provision of the constitution.
*516 The constitutional validity of the eleventh section of the city charter, is, therefore, necessarily involved in the revision by this Court, of the decision of the Circuit Judge.
The Legislative authority to establish municipal corporations, and to delegate to them any local power which the Legislature itself possessed, has not been controverted in the argument of this case, and is not doubted by this Court. But it is equally indisputable that no local power could have been delegated to the city of Lexington, or can be constitutionally exercised by it, unless the Legislature itself possessed the same power, and might have exercised it.
The counsel for the city insisted, that the authority asserted in this case, is that of taxation, and that the power to levy taxes, though admitted to be liable to great abuse, is nevertheless unlimited.
But if the assessment against McQuillan’s heirs, should be deemed a tax, we cannot admit that the taxing power is, in this country, altogether arbitrary. Such a doctrine would be no less alarming than anomalous.
When shall a tax be levied ? To what amount? Shall it he a capitation or property tax? Direct or indirect? Ad valorem or specific ? And what classes of property are the fittest subjects of taxation?—are all questions wisely confided by our constitution to the discretion of the Legislative department, subject to no other limitation than that of the moral influence of public virtue, and responsibility to public opinion.
But in some other respects, and so far as the power of taxation may be effectual without being thus limited, it is, in our judgment, limited by some of the declared ends and principles of the fundamental law. Among these political ends and principles, equality, as far as practicable, and security of property against irresponsible power, are eminently conspicuous in our State Constitution. An exact equalization of the burden.of taxation, is unattain *517 able and utopean. But still there are well defined limits, within which the practical equality of the constitution may be preserved, and which, therefore, should be deemed impassable barriers to Legislative power. Taxation may not be universal; but it must be general and uniform. Thus, if a capitation tax be laid, none of the class of persons thus taxed can be constitutionally exempt upon any other ground than that of public service; and, if a tax be laid on land, no appropriated land within the limits of the state can be constitutionally exempted, unless the owner be entitled to such immunity in consequence of public service. The legislature, in the plenitude of its taxing power, cannnot have constitutional authority to exact from one citizen, or even one county, the entire revenue for the whole Commonwealth.
Such an exaction, by whatever name the Legislature might choose to call it, would not be a tax, but would be undoubtedly the taking of private property for public use, and which could not be done constitutionally, without the consent of the owner or owners, or without retribution of the value in money.
The distinction between constitutional taxation, and the taking of private property for public use by legislative will, may not be definable with perfect precision. But we are clearly of the opinion that, whenever the property of a citizen shall be taken from him by the sovereign will, and appropriated, without his consent, to the benefit of the public, the exaction should not be considered as a tax, unless similar contributions be made by that public itself, or shall be exacted rather by the same public will, from such constituent members' of the same community generally, as own the same kind of property. Taxation and representation go together. And representative responsibility is one of the chief conservative principles of our form of government.
When taxes are levied, therefore, they must be imposed on the public in whose name and for whose benefit they are required, and to whom, those who impose them are responsible. And, although there may be a discrimination in the subjects of taxation, still persons in the same class, and property of the same kind, must generally be subjected *518 alike to the same common burden. This alone is taxation, according to our notion of constitutional taxation in Kentucky. And this idea, fortified by the spirit of our constitution, is, in our judgment, confirmed by so much of the twelfth section of the tenth article as declares “nor shall any man’s property be taken or applied “ to public use without the consent of his representatives, “ and without just compensation being previously made “to him. ”
The object of this great guarranty was to secure every citizen against spoliation by a dominant faction, or by a rapacious public power, acting in obedience to the will of a constituent body for whose use his property may be taken, and from whom no similar contribution is required. It intended that public responsibility, and the power of exaction for public use, should be, in some degree, commensurable ; and therefore, it should be understood as providing that the public shall not take the property of any citizen for its own use, without his consent or an equivalent in money or in similar contributions by itself.
If this be not its practical effect, it is a mere brutum fulmen, and may always be evaded by exactions made in the false semblance of taxation.
If the Legislature in constructing a turnpike road or railway, should provide, by an act of assembly, that every owner of land through which the projected, road should be made, should pay, in the form of a tax, the estimated value of so much of his land as might be appropriated by the road to public use, would such a requisition be a constitutional tax? And could the citizen without his consent, be deprived of his land, and all compensation therefor, by any such evasion? Would not every such case be one in which, according to the intent of the twelfth section of the tenth article of our state constitution, private property had been taken and applied to public use, and the owner not consenting, was therefore entitled to compensation, and could not be deprived of it by charging the amount to which he was entitled, in the form of a tax on his land?
As land cannot be taken and applied to public use, without paying the value of it in money if required, there *519 fore, money cannot be taken at all, and applied to any public use to which land could not be appropriated without paying the value of it.
The state is divided into subordinate communities or quasi corporations, as counties, cities, towns—each of which, to a prescribed extent, may regulate its own internal affairs; subject, however, especially in the exercise of the power of taxation, & the right of taking private property for public uses, to the same restrictions as the general legislature.
Then, could the Legislature constitutionally require the owner of the land on the Kentucky river, where one of the locks is constructed, to pay the whole cost of the lock and dam? Certainly not, as we confidently think, But why not? Because, even if the exaction be made in the form of a tax, it is not a tax, but is clearly the taking of private property for public use, without an equivalent in money, or any constitutional compensation. And it was not a tax, because it was not general or public, put personal and exclusive, exacted by the public for its own use, from an individual alone, and not from the public.
The comprehensive view we have thus endeavored, as summarily as possible, to take of the constitutional principle which must govern this case, was heretofore suggested in the case of Sutton’s Heirs vs. The City of Louisville, 5 Dana, 28, That case and this, however, differ essentially; and therefore, the application of the same principle to the one, may not authorize the conclusion established by it in the other. But whether it does or not, is the question now to be considered.
The Commonwealth of Kentucky is subdivided into subordinate communities, or quasi corporations—as counties, cities and towns; each vested to a prescribed extent, with certain local power to regulate its own peculiar concerns, according to its own will, Lexington is thus possessed of this local sovereignty over its own streets, and its own citizens, as prescribed by its charter of incorporation, and so far as that charter is consistent with the supreme law of the land. When acting for itself, under the authority of its charter, and the sanction of the constitution, the local public of Lexington should, therefore, like the Commonwealth itself, be considered as a separate and independent body politic; and what we have said concerning the public, and its authority to impose taxes, or apply private property to its own use, should, of course, be applied to the local public of Lexington, *520 as one entire and sovereign body, acting for itself, and on itself alone.
The streets &c. in a town or city (Lexington,) are common highways, which all the citizens have an equal right to use, and which it is their common duty, as a local public, to render useful and to preserve; and, if the Legislature cannot (as they Clearly cannot,) impose upon any one citizen the whole burden of Constructing a public road—neither can any municipality exact the cost of opening or repairing a street, from any particular citizen: each and everyone, neither case, must contribute his proper share. If the improvements were substantially the same, in the course of a fiscal year, thro’out the city, each citizen might, perhaps, be assessed with the expense of those in front of his lot; as a slight and unavoidable in equalty in the levying of a public burden would not render it unconstitutional. But such an assessment upon an individual can not be justified by the remote, contingent, uncertain, possibility, that a similar burden, for a similar purpose, will eventually, and in process of time, be imposed upon every other citizen.
The streets and side walks in the city of Lexington, are common highways, which every citizen has an equal right to use, and which, therefore, it is the common duty of the citizens of that local public to render useful and to preserve. And consequently, if the Legislature, acting for the Commonwealth, could not, in the form of a tax or otherwise, constitutionally impose on any one citizen the burden of making, or of paying the cost of constructing, a public road, for the common use and benefit of the public, the municipal council of Lexington could not lawfully exact from any one of its citizens, in the form of a tax or otherwise, the cost of constructing, re-constructing or repairing any one of the streets of that city. Each citizen may, undoubtedly, be required to do his equal share of work on the local highways, or to make his equal contribution in money for work done on them by others under the authority of the council. And if all those ways should be re-constructed or repaired during the same fiscal year, we are not prepared to question the public authority to require each of the owners of ground on the streets respectively, to pay one half of the cost of the improvement made opposite to his lot. Such a burden imposed on all the citizens owning real estate in the city, would be sufficiently public and distributive to entitle it to the character of a public tax, and neither a slight inequality in the actual operation of the prescribed ratio of contribution, nor the want of universality in the application of it to all concerned in the improvement of the city, would be sufficient to prove that such a requisition would be unconstitutional, or even unjust. This was decided in the case of The Trustees of Paris vs Berry, (2 J. J, Marsh. 483,) and it is all that was there adjudged by this Court.
But can one citizen alone be compelled to pay the cost, or one half of the cost, of grading or paving any one street in Lexington, for any one year, or at any one time? He cannot, as we think, unless the requisition could be enforced on the ground that, whenever other streets or portions of streets shall thereafter be also improved in a *521 Similar manner, the like burden may fall exclusively on other citizens successively.
The charter bf the city of Lexington (§11) may be understood as constituting each, square of the city, a separate municipality, having authority to regulate the streets and side walks within it; and as such, the owners of the larger portion of the ground within a square may (by petition) require that the streets within it, shall be improved at the cost of the owners of the lots — each one contributing his dueproportion according to the extent of his ground upon the street. And—
Tho’ the holders of the property within a square cannot be compelled to pay for work done upon one of its streets, without the sanction of their representatives, (when they have not petitioned;) yet, as they are represented in the city counsel, and the charter requires (§11) a unanimous vote, to grade and pave a street, in any square, at the cost of the citizens thereof, when they have not petitioned for it — an order made for such purpose, may be considered as being made with the assent of the representatives of the square.
The principle upon which the streets, &c. of Lexington may be improved by squares, at the cost of the owners of the lots within the square (under the 11th sec. of the charter,) is substantially the same as that by which the county courts require roads to be made and kept in repair, by the citizens of the county; and which has been long practiced upon, without question as to its constitutionality; and which is similar to what is practiced upon, and has been held to be constitutional, in other states, and which this court is not prepared to decide unconstitutional.
But such a prospective and contingent equalization of contribution to the public use, would be too remote and uncertain to have such an effect as that just hypothetically supposed. It might, in our opinion, be as well said that the Legislature may exact from one citizen or county alone the entire revenue for one year, because similar exactions might be made from other citizens or other counties; successively, for a long series of consecutive years, until the whole Commonwealth had been equally taxed. This final result may never be accomplished in the one case more than in the other.
But, so far as the streets and side-walks may be concerned, the 11th section of the charter may be understood as having the effect of subdividing the city into as many municipalities as there are squares in it, and as giving to each square the municipal authority to regulate, in the mode prescribed, its own streets and side-walks. And, in this view, we are not disposed to question the power of those who own the larger portion of the ground in any one square, to require the improvement of the streets and side walks opposite to such square, and the payment of the cost by all the proprietors of ground in it, according to one of the provisions of this 11th section.
It does not appear, however, that the grading and paving done in this case, were ordered on the application of any of the owners of ground in the square of which the lot of McQuillan’s heirs is a part. On the contrary, we must presume, from the facts as agreed, that the order was made by the unanimous vote of the council without any such application. Does this make any essential difference, so far as constitutional power is concerned? As each square, so far as its streets and side walks are con *522 cerned, may be considered as a distinct municipality or local public, if the improvements made opposite to the square, including the lot of McQuillan’s heirs, had been directed or sanctioned by the owners of the greater portion of the ground in that square, the cost of the work would have been levied, according to the charter, on the whole of this subordinate community or public by its own exclusive authority, and according to its own aggregate will. And therefore, considering this square, for that purpose, a distinct and separate town, there could be no more objection to such a levy than there might be to a similar one made by the city itself, on all its citizens, or by a county court on the citizens of its county.
But, though, for the purpose suggested, the several squares in the city of Lexington, may be considered as so many distinct towns, yet when a square does not determine for itself, in favor of such an improvement, can the city council decide for it, and control it, as to the construction or reparation of a street or side walk opposite to it? Can it be thus controlled by an extraneous power? Under the 11th section of the charter, and for all the purposes thereof, the several squares in the city of Lexington, are, to the whole city, what the counties are to a state, or townships to a county.
Each county may be required, and is here required, to make and preserve, within its own limits, and at its own expense, all highways necessary for public use; and which, though they are its own, in a peculiar sense, belong, never’ theless, to the whole Commonwealth, in a more enlarged sense. In the construction and preservation of its roads, each county is controlled by the justices of its court, who are, in this respect, made its organs, though they are neither elected by it, nor made officially responsible to it. Yet the validity of the power given to the county courts, [to require the people of their respective counties to make and repair their local highways, is not doubted. And, although the roads in one county may cost more, or be better, than those in another, still there is an approximation to equality of burden among them, and those counties in which the roads are best and cost most, derive most, advantage from the public use of them.
*523 So, each square in Lexington may be more benefited than any other portion of the city, by having around it good streets and side walks, which like the roads in a county, or a township, are, therefore peculiarly its own. And as the 11th section requires unanimity in the counsel, no one square can be compelled to pay for work done on one of its streets or side-walks, without the sanction and order of. its own representative, who, though elected by, and responsible to, the proprietors of all the other squares in the same ward, is, nevertheless, its legal organ.
Besides, the city council, representing, as it does, the whole confederation of squares, may be deemed the representatives of each square, in some such sense as that in which the justices appointed by the Commonwealth, may be considered as the representatives of the interest and public will of the people of any one county. Graded and paved streets are common in Lexington, and should be desired and expected in such a city, by all the citizens; and each square being made liable for the cost incident to its own streets and side walks, under the control of the unanimous city council, though the burthen on one square may sometimes exceed that of another—yet there appears to be amongst them all, as much, or nearly as much, reciprocity as that which exists, in a similar respect, among the several counties of the State.
As all the streets and side-walks may be expected to be improved, at some time, in a manner substantially the same—the principal question decided by the council, in this case, was only as to the time when those opposite to the square including the lot of McQuillan’s heirs, should be improved. The county court decide similar questions without objection to their power, or the validity of their decision.
All the streets have been made many years prior to the incorporation of the city; most of them had been graded and paved prior to the year 1826, and always in the mode now objected to, as unconstitutional. Other cities in the United States, as well as in Europe, have been improved in a similar manner; this mode and this usage, in town's and cities, may have been generally understood when our *524 constitution was adopted; the 11th section of the charter of Lexington only re-enacted what had been the established rule respecting its streets and side-walks; the citizens were familiar with that rule, and, thus understanding it, they accepted the charter as it is. In Louisiana, South Carolina and Pennsylvania, the judiciary has sanctioned, as constitutional, the application of the same or a similar principle to the streets and side-walks of cities in those States, respectively; in New York and Massachusetts, it has been virtually recognized by the State courts; and it has been declared unconstitutional by no court, so far as we have been able to ascertain.
Under a proper view of all the foregoing considerations, can this Court decide that the ordinance now sought to be invalidated, is unconstitutional and void? Can we determine judicially that it has violated the principle of practical equality contemplated b.y the genius of our organic law, or disregarded the Anglo-American doctrine, that taxation shall go hand in hand with representation? We are unable to prove this, although we may have some doubt whether it is not so. But, even doubting, it would be our duty to acquiesce in the legislative decision, and in public opinion as long indicated in this, as well as most of the other states of our Union, by common usage, sanctionen by general acquiescence, and, in some states, by judicial authority. In this particular case, there may be hardship, possibly injustice. But our duty is to decide as to the power; not the expediency or justice of its exercise. And it is not even certain that there will be any peculiar hardship in the case, when there shall be a proper re-assessment, according to the principle which we have recognized and established in this opinion; whereby the contribution which jnay be exacted from McQuillan’s heirs, may be reduced to a sum not exceeding perhaps two hundred and fifty dollars, and which may and probably will be reimbursed in the enhanced value of their lot.
The ratio of contribution fixed in this opinion, may relieve McQuillan’s heirs from paying more than other citizens in a similar condition have had to pay, for streets and side walks fronting their grounds, and improving their *525 common city; and all other owners of lots in the same city, may, and probably will, have to bear, in sufficient and proper time, their own equal burden in improving, in like manner, their own local ways; in the improvement or non-improvement of which they too have a peculiar and important interest. And we cannot decide that, when the improvements are, according to the charter, to be made separately by squares, the ordinance made, in this case, was void, merely because all other streets were not required to be improved, in the like manner, at the same time.
A case might possibly occur, in which the inequality and. injustice would be so. flagrant, as to induce this Court to decide that, there had been unwarrantable oppression, or an inconstitutional perversion of power. But this case, though apparently rather uncommon, is not, in our judgment, so enormous as to authorize such a decision now on that ground.
Wherefore, as we are not prepared to decide that any provision in the 11th section of the city charter of Lexington, is unconstitutional, our conclusion must be, that the Circuit Judge erred in enjoining the city from enforcing against McQuillan’s heirs, the payment of any portion of the cost of grading and paving the street and side walks opposite to their lot.
And therefore, the decision of the Circuit Judge is reversed, and the cause remanded, with instructions to modify the injunction, so as only to enjoin the city from proceeding to enforce the illegal assessment, as heretofore made, and attempted to be enforced.