BRINKERHOFF, J.
Accompanying the application for leave to file a petition in error in this case, is an agreement of counsel for the respective parties, that the case shall be finally decided, and the judgment affirmed or reversed, upon the present application.
Ordinarily, the court would not act upon such an agree *336 ment of counsel, and thus give a recent case preference over other cases pending on our docket. But we have thought best to do so in the present case, for the reason that it is supposed to be a matter of considerable public interest that the constitutional questions involved in the case should have an early adjudication.
The first section of the amendatory act of April 14,1857, under which the proceedings complained of in this case were had, and the provisions of which, so far as they have any bearing upon the questions under consideration, are in no way qualified by the remainder of the act, is as follows :
“ That the township trustees shall have power, on the application of any party, to enter upon any land in their township to view any water-course or proposed ditch for the purpose of draining any land held by more than one person, and to cause said ditch or water-course to be located and set apart to each person interested in such ditch or water-course, such portion of the same to he by him opened, as shall be deemed by them right and just, according to the benefit to be derived by such person from the opening of said ditch or water-course ; and also to assess against him such portion of the expenses and damage hereafter provided for, as according to right and justice he ought to pay.”
This act, it is argued, is in contravention of the second section of the twelfth article of the constitution, which provides “ that laws shall be passed, taxing, by a uniform rule, all moneys, credits, investments in bonds, stocks, joint stock companies, or otherwise; and also all real and personal property, according to its true value in money,” etc.
And the question is now presented: Is the assessment authorized by this act embraced within the meaning of the term “taxing,” in the above clause of the constitution ? If it is, the act and the assessment are unconstitutional and void, and there is an end of the inquiry; if not, the case is open to further investigation.
Some very important and leading points in this inquiry have been already considered and settled by this court, in the case of Hill v. Higdon, 5 Ohio St. Rep. 243, and reaffirmed in several succeeding cases. The question involved in that case was as to the constitutional validity *337 of an act of the general assembly, under the present constitution, authorizing an assessment, by the corporate authorities of Cincinnati, upon the lot of the plaintiff in error, according to the front foot, of the expense of grading and improving the adjacent street. That case was decided, after full and repeated argument (in that and other eases), after many doubts and long and careful consideration. And we all agree, that notwithstanding the doubts at first entertained, the conclusions arrived at rest upon a foundation of reason unanswerable and impregnable.
The main points decided in that case, were—
.. 1st. As respects the power of the general assembly to authorize assessments for the improvement of streets by cities and villages, it is included within the general grant by the constitution, of legislative power to the general assembly.
2d. That such assessments are not within the purview of the word “ taxing,” in the clause of the second section of the twelfth article of the constitution, requiring all property to be taxed “ by a uniform rule, according to its true value in money.”
3d. That the clause of the second section of the twelfth article of the constitution above given, is only “ applicable to, and furnishes the governing principle for, all laws levying taxes for general revenue, whether for state, county, township, or corporation purposes.”
4th. That “ in the exercise of the power of assessment by municipal corporations, legislative discretion in apportioning the burden according to benefits, is left as broad and unfettered as under the constitution of 1802.”
Eor me to attempt to give the reasoning from which these conclusions were drawn, without quoting the opinion in that case at length, would be but to weaken its force, and I shall not, therefore, attempt it; but, simply for the purpose of making myself intelligible in my subsequent remarks, I may say that, although such assessments are a species of taxes, and included within the term taxes, in its *338 most general sense, yet there has been established, by the decisions of courts of high authority, a distinction between assessments and taxes proper; and that this distinction is, by irresistible implication, recognized by the present constitution, in the sixth section of the thirteenth article, which is as follows:
“ The general assembly shall provide for the organization of cities and incorporated villages by general laws ; and restrict their power of taxation, assessment, borrowing money, contracting debts and loaning their credit, so as to prevent the abuse of such power.”
Unless we admit that the framers of this constitution were guilty of nonsensical tautology, the use, in this section of the constitution, of both words, “taxation” and “ assessment,” is, by necessary implication, a recognition ■of the distinction between them, and also of the existence of the power to authorize assessments; for a constitutional mandate upon a legislative body to restrict and provide against the abuse of a power, presupposes its existence.
Taxes are impositions for purposes of general revenue; assessments are ^special and local impositions upon property in the immediate vicinity” of an improvement for the public welfare, “ which are necessary to pay for the improvement, and laid with reference to the special benefit which such property derives from the expenditure.” The clause of our constitution last above quoted, was borrowed, substantially, and almost literally, from the constitution of New York of 1846; and in a case presenting a similar question to that in Hill v. Higdon, arising under that constitution, the same principles were asserted and distinctions defined as in Hill v. Higdon, and upon similar grounds. The People v. The Mayor, etc., of Brooklyn, 4 Comst. Rep. 440.
This much being settled by the case of Hill v. Higdon, the question is now, for the first time, presented to this court, whether the power in the legislature to authorize assessments is limited to its exercise by cities and villages, or whether it still exists in all its integrity, and to the full *339 extent to -which, it was, prior to the adoption of the new constitution, exercised and recognized in the legislation of this state and in that of the other states of the union.
It is urged in argument, that inasmuch as the power of authorizing assessments, as distinct from taxes proper, is, by the language of the constitution, recognized only in connection with its exercise by cities and villages, therefore, under the maxim expressio unius, etc., the power of the legislature to authorize assessments must be limited to its exercise by cities and villages. This argument would be entitled to very great, and, it seems to me, conclusive weight, if the clause of the constitution referred to contained, or was intended to express, a grant of the power of assessment as distinct from that of taxation proper. In that case, the grant being in terms limited, the maxim, expressio unius, would fairly apply, and all implication of power beyond the terms of the grant, would be held to be excluded. But such is not the case. That clause of the constitution does not contain, nor is it intended to express, any grant of the power of assessment. It merely mentions the power of assessment as an existing power, and does this simply in a mandate upon the legislature to restrict its exercise, and provide against its abuse by cities and villages. There being in this clause of the constitution no express grant of the power of assessment, and no affirmative declaration of its existence, but a recognition of its existence by implication only, there is no case to which the maxim, expressio unius, etc., can legitimately apply. By providing .against the abuse of a power, the constitution, by inevitable implication, recognizes the existence of that j)ower; but because the framers of the constitution thought it necessary to guard against its abuse by a single agency only, it by no means follows that it was intended to restrict its exercise to that agency alone. It argues this, and this only, that the framers of the constitution thought the power peculiarly liable to abuse when committed to cities and villages; and against its abuse by them, they *340 thought it wise to enjoin it upon the legislature to guard. This clause of the constitution having, by necessary implication, recognized the existence of the power of assessment, and, by like* implication, distinguished it from the power of taxation, as defined and regulated in other parts of the constitution, its effect upon the question before us is at an end; and, it seems to me, leaves the power of assessment intact, in all its integrity and extent, the same as it was under the constitution of 1802.
Although the argument for a distinction between the power of assessment and that of taxation proper, is greatly strengthened by the implications derived from this clause of the constitution, yet that distinction by no means depends on those implications alone. The distinction was judicially recognized and established long before either the present constitution of Ohio or that of New York, from which the clause referred to was borrowed, were framed. Of this the case of The matter of the Mayor of New York, 11 J. R. 77, is an instance. It appeared in that case, that by a general statute of the state, it was proved “that no real estate belonging to any church or place of public worship,” etc., “ shall be taxed by any law of this state.” And the lots of certain churches in the city of New York had been assessed by the authorities of the city, for the improvement of streets adjacent to them. And the assessment was sustained by the court, on the ground that it was not a tax within the meaning of the general statute.
The power of the legislature to authorize assessments, then, being left, in all its breadth, unfettered by the present constitution, as it was by the constitution of 1802, the meaning of the term, and its reach and scope, can be determined only by a reference to legislative history, and to the approved and established precedents which it affords. Referring, then, to legislative history, it is a matter too notorious and familiar to -need particular remark, that probably ever since the existence of incorporated cities or villages in our state, the power of assessment, under dele *341 gated legislative authority, has been in constant and active exercise for the improvement of streets and sidewalks.
As early, at least, as January 29, 1846, some five years before the present constitution took effect, and beginning with the act of that date, “ to lay out and establish a free turnpike road from the town of Perrysburg to the north line of 'Wood county,” a policy was inaugurated for constructing, in the northwestern quarter of the state, free turnpike roads, through the medium of corporations created for that purpose, and authorizing the assessment for this purpose of a special tax upon lands situate within a given distance of the proposed road. A series of such acts of incorporation, an enumeration of which would be tedious and useless, differing in the detail of their provisions, but similar in principle, were passed from year to year, up to the time of the taking effect of the present constitution.
On the 26th of March, 1841,'was passed an act “providing for the appointment of commissioners of sewers in certain counties in this state.” This act was local in its application, but embraced within its purview forty-one enumerated counties. It authorized, under particular regulations therein prescribed, th'e location and construction of dams and drains, and the removal of obstructions to watercourses, to facilitate the drainage and prevent the overflow of swamps, marshes and flat lands, and required the cost of the work, as well as the damages accruing therefrom to individual proprietors, to be assessed upon lands benefited thereby, in proportion to such benefits. This act remained in force and unamended until the constitution of 1802 was superseded; it was amended April 30th, 1852, and on the 24th of February, 1853, the original and amended acts were repealed and superseded by a general act, and that was repealed and superseded by the act of May 1, 1854, which, with the amendatory act of April 14, 1857, are still ostensibly in force, and under which the proceedings complained of in this case were had.
*342 Tbis is a-brief and condensed outline of the legislation of our state on these subjects; and from it the conclusion is obvious, that at the time of the formation of the new constitution, assessments for purposes of local improvement, in the construction of free turnpike roads, and the drainage of swamps and low lands, must have been as familiar to our people and to the members of the constitutional convention as were assessments for streets and sidewalks in municipal corporations.
In respect to the legislation of other states on matters of this kind, the language of Ruggles, J., delivering the opinion of the court of appeals of New York, in The People v. The Mayor, etc., of Brooklyn, embraces all that need be said on the subject. He says:
“ Taxation similar to that now in controversy has been sanctioned by long usage in this state and elsewhere.
“ In England, the commissioners of sewers assess the lands affected by their operations, without reference to other locality. (23 H. S, ch. 5, sec. 3; 4 Evans’ Stat. 26.)
“ In Massachusetts, meadows, swamps and low lands, may be assessed among the proprietors for the expense of draining the same, without reference to any political district, and in proportion to the benefit each proprietor derives from the work. (E. S. of Mass. 673.) In Connecticut, the same power is given by statute to commissioners for draining marshy lands. (Stat. of Conn., ed. of 1839, p. 544.)
“ In Pennsylvania, South Carolina and Louisiana, taxation upon this principle has been practiced and sanctioned as constitutional. (9 Dana 524.) And in New Jersey, Maryland, Virginia, Ohio and Indiana, it is understood that local taxation upon similar principles is authorized by law. In the colony and State of New York, the system of taxation for local purposes by assessing the burthen according to the benefit, has been in force for more than one hundred and fifty years. It was applied to highways in the county of Ulster in 1691. (Bradf. Laws 45.) The power was given to the corporation of New York in the same year. (Ib. 9.) This statute remained in force in 1773, when Van Schaack’s edition of the statutes was published, and no evidence of its repeal is found until 1787, when it seems to have been revised, and its provisions re-enacted under the state constitution. (Van Schaack’s Law 8, 9 ; 2 Jones & Var. 152 ; 1 Greenl. 443.) The colonial statute was, doubtless, in force when the state constitution was adopted. It is not unworthy of remark, that in April, 1691, a bill of rights was passed for the security and protection of the people of the province. The statute authorizing the assessments first mentioned was passed afterward, during the same year. In January, 1787, an act was passed declaring the rights of the citizens of this state, and prohibiting, among other things, *343 that any person should be deprived of his property except by due course of law. The statute of 1787, authorizing street assessments in the city of New York, was passed by the same legislature, and sanctioned by the same council of revision, which had assented to the bill of rights. * * * *
“ This system of taxation was in force at the time of the making and adoption of our first, second and third constitutions, and has stood in our statute books along with the constitutions, from 1777, until now, without prohibition or restraint. Sales of real estate to large amounts have been made, and the lands so sold are now held on the faith of the validity of these assessment laws. Proceedings under them have been brought before the supreme court for review, continually during the last thirty years. They have been litigated often on the ground of irregularity, and sometimes upon constitutional objections. They have been confirmed in cases almost without number. If the uniform practice of the government from its origin, can settle any question of this nature, the power of the legislature to exercise this kind of taxation would seem to be established by it.”
It has been strongly urged, that tbis power is peculiarly liable to abuse. It is liable to be abused; perhaps peculiarly so. But so is all government, and all governmental powers. Yet government is, nevertheless, a necessity among men. It is a very bad government, indeed, which is not better than the inevitable anarchy and outrage which follows the absence of all government. And the fact that a power is liable to be abused affords no conclusive argument against its existence.
The published debates of the constitutional convention throw no light upon this question. So far as the public action of that body is concerned, the matter seems to have been passed upon sub silentio.
Perhaps we are not at liberty to argue and infer the existence of the power in question from its apparent necessity. Yet, if such necessity exists, it certainly affords a sufficient reply to the argument against the existence of the power drawn from its liability to abuse. Let us look for a moment at this aspect of the case.
The exercise of certain powers of government are often imperiously demanded by peculiar topographical and climatic conditions. In Holland, nearly the whole surface of which is lower than the sea at high tide, the regulation of dikes and drains becomes a necessary function of gov *344 ernment. So does the matter of irrigation in Egypt, Peru, and some other countries. It is notorious that a large district in the northwest portion of this state, not less probably than one-sixth the whole, and possessing elements of unsurpassed fertility — while it is sufficiently elevated above Lake Erie on the one side, and the basin of the Ohio River on the other, and almost every where with sufficient inclination in some direction, readily to carry off its surplus waters, if there were channels for its conveyance —has yet such an unbroken surface, and is so destitute of ravines and natural channels, as to render the appellation of “ black swamp ” appropriate and familiar, and the district proverbial — more so probably than it really deserves —for dampness, miasm and disease. To this large district, capable of transformation, and in fact now being rapidly transformed, into a region at once healthful and productive, drains are a necessity. They must often be several miles in extent, and laid out with reference to some general plan. It is easy to see that the execution of these works is beyond the power of isolated individual effort, and that the public authority must be invoked to prescribe the location and plan, and thus to overrule the conflicts of individual opinion and individual selfishness. It is certainly possible to ¿xecute these necessary works by means of assessments upon property in proportion to benefits received, and thus to secure results more equitable to individuals than could be obtained in any other way, or by any other system of taxation. Looking, therefore, to the m'gent necessity for the exercise of this power, however cogent may be the considerations which address themselves to the legislature to induce that body carefully to guard against its abuse, I can see no cause to regret, and no argument against, its existence.
¥e conclude, therefore, that the power of the general assembly to authorize local assessments, in proportion to benefits conferred, for the construction of free turnpike *345 roads, and for the drainage of lands, remains unabridged by any provision of the present constitution.
It is proper, however, that, before concluding this branch of the case, I should say, as a matter of justice to my brethren, that the considerations which I have thus presented, are more clear, convincing and conclusive to my mind than they are to theirs; but all of them are of opinion that they are weighty enough to render the unconstitutionality of such assessments too doubtful to justify judicial interference with legislative discretion. If, therefore, the act of May 1, 1854, and the act amendatory thereto, presented no constitutional question other than that in relation to assessments, we should not feel ourselves at liberty to hold it to be unconstitutional. But,
2. It is claimed on the part of the plaintiff, that this act authorizes the taking of private property for private use, without the consent of the owner, and is, therefore, in contravention of the nineteenth section of the bill of rights, which is as follows :
“ Seo. 19. Private property shall ever be held inviolate, but subservient to the public welfare. When taken in time of war or other public exigency imperatively requiring its immediate seizure, or for the purpose of making or repairing roads which shall be open to the public without charge, a compensation shall be made to the owner in money; and in all other cases where private property shall be taken for public use, a compensation therefor shall first be made in money, or first secured by a deposit of money; and such compensation shall be assessed by a jury without deduction for benefits to any property of the owner.”
The first clause of this section, guaranteeing the inviolability of private property except as subservient to the public welfare, clearly prohibits the taking of private property for private use, without the owner’s consent. And so it has been held by learned commentators and courts of high authority. In the matter of Albany Street, 11 Wend. Rep. 149; Bloodgood v. M. & H. R. R. Co., 18 Wend. Rep. 9, 59; Varick v. Smith, 5 Paige’s Rep, 137; Sedg. on Const. Law 514, 515.
We can see, in the act in question, nothing objeetiona *346 ble in the fact that the township trustees shall have power to act upon the application of a single party; nor in the fact that they may locate the proposed ditch upon lands held by two owners only. ( All public movements must originate in individual action; and two persons only may be proprietors of vast tracts of land; or, if the tracts be small, they may be so situate relatively, or they may be characterized by such peculiarities, as to render their drainage a very proper matter of public concern. But it is a much more serious subject of inquiry, whether this section does not, in effect, authorize the entry upon lands and the construction of drains, when demanded by private interest merely, without reference to the public interest, convenience, or welfaré: j- It seems to us clear that it does. If the trustees had been authorized to locate and provide for the opening of a ditch only in case they found the same to be demanded by, or conducive to, the public health, convenience, or welfare, then their action, under legislative authority, would be but an ordinary and legitimate exercise of the right of eminent domain. But this statute prescribes no such condition — no such rule of official duty or limit to official discretion; and a ditch may be located and opened upon the lands of individual proprietors solely for purposes of private interest, irrespective of the public welfare, without infringing any provision of this act, either express or implied.
Is this an infringement upon the inviolability of private property — a taking of private property for private use ?
The land occupied by the ditch and its banks is not, it is true, wholly appropriated. The owner may still use the ditch itself for purposes of irrigation, for watering stock, or may perhaps make it serve the purposes of a fence. He may grow timber and shrubbery on its banks. But his dominion over it — his power of choice as to the uses to which he will devote it, ax’e materially limited; in short, other parties acquire a permanent easement in it. An easement is property; and to the extent of such easement, *347 it is clear to us, that private property is taken, within the meaning and spirit of the constitutional prohibition'.
The decisions in other states, on questions bearing on this point, seem not to have been uniform. Sedg. on Const. Law 519, et seq. But the doctrine here maintained is settled, in Ohio, by repeated adjudications, and on principles which, we think, cannot be shaken. Crawford v. Delaware, 7 Ohio St. Rep. 459.
. It is contended by counsel for plaintiff that this act is unconstitutional, for the reason, as is alleged, that it does not provide a compensation in money for the property taken; but in this.respect, we think the act is unobjectionable. But we are unanimously of the opinion that the act does authorize the appropriation of private property for private purposes, irrespective of the public welfare, without the consent of the owner, and is, therefore, in contravention of the 19th section of the bill of rights.
The judgment of the court of common pleas is reversed, and the cause remanded for further proceedings.
Swan, Scott and Sutliee, JJ., concurred.