JAMES D. PARKER ET ALS. v. COMMISSIONERS OF JOHNSTON
COUNTY.

(Filed 24 September, 1919.)

**Constitutional Law—Stock Law—Repealing Statutes—Funds on Hand—Distribution—County Funds—Counties.**

Where by legislative enactment a county has been placed under a stock law, the statute directing that stock law fences shall be sold and the proceeds derived from the sale and any stock law funds on hand shall be returned to the general fund of the county, is mandatory and also constitutional.

WALKER, J., dissenting.

APPEAL by plaintiffs from *Kerr, J.,* at April Term, 1919, of JOHNSTON.

*S. S. Holt and Parker & Parker for plaintiffs.*
*Abell & Ward for defendant.*

CLARK, C. J.   This is an action, upon facts agreed, to compel the commissioners of Johnston County to distribute and refund the surplus of the fund which had been collected in said county to construct and maintain a stock law fence.   The whole of Johnston County having been placed under the stock law by legislative enactment, the necessity for the continuance of said fence had ceased.   Thereupon by sec. 4, ch. 466, Public-Local Laws 1915, it was provided: "The board of commissioners of Johnston County is hereby authorized to sell for cash, at public or private sale, all stock law fences in the county, and the proceeds derived from the sale of the same, together with any stock law funds now on hand, shall be returned to the general fund of said county." This statute is clearly mandatory.

The plaintiffs claim that this statute is unconstitutional and seek to have the fund distributed to the landowners from whom it has been collected as a special assessment.   The surplus consists of something over $4,000 accumulated in the several years beginning in 1912, and probably $1,500 from the sale of the fence made in compliance with the statute.   As to the latter, it is clearly county property as much so as proceeds from the sale of an abandoned courthouse or a discarded bridge or any other kind of property.   As to the accumulated excess the bounds of the stock law have been changed from time to time, and, besides, some of those paying the assessment have died and their estates have been settled and others have moved away.   If the commissioners should have desired to refund the surplus to those who paid it in, this would have been difficult.

The cost of calculating and dividing the sums to refund to each of those who from 1912 down to this time have paid assessments for the stock law fence would be considerable.   Almost the only benefit that would accrue to any one would be the commissions to the tax collectors for again collecting the same sum for necessary county purposes.

But the only question really before us is whether there is any restriction in the Constitution forbidding the General Assembly to direct that the surplus of a fund in the county treasury collected for any purpose shall be used by the county for any necessary expenses.   We know of no such provision.   Suppose this fund had been raised by a special tax authorized by the Legislature to build a jail or a courthouse or for any other purpose, is there any constitutional restriction which forbids the Legislature from directing afterwards that the surplus which may happen instead of being returned to the taxpayers shall be used by the county for any other necessary purpose.   In the absence of a statute, officers have no power to refund taxes though illegally collected.   27 A. & E., 756.

It is true that this particular fund was collected from the real estate owners for the purpose of building a stock law fence. But there are other taxes which have been collected from certain specified sources and in like manner to be applied to special purposes. For instance, the license tax derived from automobiles is appropriated to the highway commission for the purpose of building and maintaining public roads. Should there be any unused excess of such fund by reason of funds derived from the Federal Government, or from the general property tax or otherwise, would not the Legislature have power to direct its application to general purposes?

There is also a fertilizer tax which has been appropriated to the use of the Agricultural Department and 25 cents per bale on all cotton ginned in the State to provide for a warehouse system. If for any reason there should be an excess in these funds, or if the warehouse system were abandoned, the Legislature could certainly direct that the unused surplus of these funds should be applied to other purposes, and it would not be necessary on constitutional grounds to divide up this remnant of the fund and to return dividends therefrom to the companies paying the fertilizer tax or to the farmers paying the gin tax.

There have been many other instances of taxes raised from special sources and appropriated by the act creating them to special purposes, among them the retail liquor license which went to the schools. Would it be necessary to return the surplus, if any, of such fund to the barkeepers? Whenever there is an excess, which rarely happens, it is in the power of the sovereign either to redistribute this surplus to the parties paying it in or (as probably has always been done) direct that it shall be applied to other purposes. Whether the fund has been accumulated in the State Treasury or in the county treasury, it is in the discretion of the General Assembly whether that in the State Treasury shall be applied to other State purposes and whether the funds accumulated in the county treasury shall be applied to other necessary county purposes.

It is true that the stock law funds were collected by an assessment upon real estate only, but whether it was collected from real estate or from all property or from property and polls or from license and other taxes is an immaterial circumstance which cannot affect the power of the General Assembly to direct that any fund in the county treasury unused shall be applied to general county purposes. If so applied, it will go to schools, roads and bridges and all other necessary expenses of the county. If it were returned to the real estate owners who are among the largest taxpayers the amount returned would have to be again assessed and collected. The difference between the small dividend refunded to each of the 2,600 taxpayers in this case and the amount

which would be again collected out of them to make good the deficit thereby caused in the county treasury would be almost infinitesimal.

In Connor and Cheshire on the Constitution, 282, it is said: "Where a statute authorizing the levy of a tax beyond the constitutional limit, for a special purpose, is *infra vires,* the taxes collected beyond the requirement of the special purpose may be turned into the general fund and used for general purposes."

In *Long v. Comrs.,* 76 N. C., 280, the Court says: "We know of no statute nor any rule of law, public or private, which prevents the county commissioners from applying a tax raised professedly for one purpose to any other legitimate purpose."

In *Williams v. Comrs.,* 119 N. C., 520, the Court held that where a statute authorized the levy of a tax for a lawful purpose but beyond the constitutional limit the taxes collected beyond the requirements of the special purpose may be turned into the general fund and used for general purposes, but where the act will authorize the levy partly for a legal purpose and partly for an illegal purpose, it is *ultra vires* and no part of the levy can be collected. The Court was unanimous as to the application of such taxes after collection. Though there was dissent on another point, there was no difference on the view expressed in the latter opinion that "if the levy had been authorized for two purposes only, and a surplus had been raised, it would have gone into the county treasury to meet current expenses without any further authorization of the act. *Long v. Comrs.,* 76 N. C., 275."

The plaintiff relies upon *Comrs. v. Comrs.,* 92 N. C., 180, where Lenoir and Greene counties having united to erect a stock law fence around a district lying partly in both, and Greene complained that owing to a difference in the assessment of real estate in the two counties an excessive amount had been paid by the taxpayers therein, it was adjudged that the disparity should be corrected by reassessment, and that the surplus wrongfully collected in Greene should be reimbursed by Lenoir, such fund to be held in trust by the former for the reimbursement of those who had overpaid their share.

But in that case there was no statute, as in this, authorizing the fence to be sold and the proceeds thereof and any surplus funds still in hand to be used for general purposes. It was an equalization statute between the contributors to the fund in the two counties.

We find in the Constitution nothing denying to the General Assembly the power to direct that the surplus of this fund in the county treasury (which seems already to have lain there idle for four and a half years, since this act was passed in 1915, at a loss in interest equal to more than a fourth of the fund) shall be used for general county purposes.

In *Parker v. Comrs.,* 104 N. C., 166, it is held that the requirement

in the Constitution, Art. V, sec. 7, that "Every act of the General Assembly levying a tax shall state the special object to which it is to be applied, and that it shall be applied to no other," has no application to taxes levied by the county authorities for county purposes.

In *R. R. v. Comrs.*, 148 N. C., 247, the Court said: "We do not concur with the suggestion that the commissioners have the power to levy and collect a tax for a specific purpose and apply any part of it to another purpose," giving as a reason that the taxpayer was entitled to an order enjoining the appropriation of any part of the excess over interest on the bonds to any other purpose, for it could be held to meet the interest for the following year or for a sinking fund. This clearly does not apply to cases where the purpose for which the sum is raised having been completely attained, there is a surplus left in the treasury which must either be applied to general county purposes or be returned to the taxpayers to be collected again for such general purposes, which is avoided by retaining such surplus for that use.

When a tax or assessment is paid into the public treasury of the State or a county, if the purpose expressed in the act is fully accomplished, leaving an unexpended surplus, the State or county has control of it, and bad faith cannot be imputed by the courts to the Legislature in authorizing such surplus to be "covered into the general fund."

Affirmed.

WALKER, J., dissenting: It is a mistake to suppose that this stock fence fund was collected under a levy upon all the taxpayers of Johnston County. It was collected from only a part of them. If this law is enforced it will, both in theory and in practice, be simply permitting one part of the people to be solely taxed for the benefit of another, and the cases cited in support of the opinion do not sustain such a proposition, or anything like it, but a very different one. It would be clearly violative of the principle declared in the recent case of *Comrs. of Johnston Co. v. B. R. Lacy, State Treasurer*, 174 N. C., 141. *Justice Hoke*, in his opinion delivered for the Court, says: "It is not within the legislative power to tax one community or local taxing district for the exclusive benefit of another—a principle which has been directly approved in several recent decisions of this Court, and is one very generally accepted," citing *Keith v. Lockhart*, 171 N. C., 451; *Faison v. Comrs.*, 171 N. C., 411; *Harper v. Comrs.*, 133 N. C., 106; *Comrs. Prince George v. Comrs. Laurel*, 70 Md., 443; *Lumber Co. v. Township of Springfield*, 92 Mich., 277; *People of Salem, supra*, citing *Lexington v. McQuillan's Heirs*, 39 Ky., 513; Cooley on Taxation (3d Ed.), 420; Judson on Taxation, sec. 254; 37 Cyc., 749. He adopts what *Judge Cooley* says upon the subject, as follows: "The taxing district through

which the tax is to be apportioned must be the district which is to be benefited by its collection and expenditure. The district for the apportionment of the State tax is the State, for the county tax the county, and so on. Subordinate districts may be created for convenience, but the principle is general, and in all subordinate districts the rule must be the same." Cooley on Taxation, *supra.* And also the general principle, as stated by another standard text-writer, was approved. "The constitutional requirement of uniformity of taxation forbids the imposition of a tax on one municipality or part of the State for the purpose of benefiting or raising money for another." 37 Cyc., *supra.* He further says, and what he says completely covers this case as with a blanket: "It is a fundamental principle in the law of taxation that taxes may only be levied for public purposes and for the benefit of the public on whom they are imposed, and to lay these burdens upon one district for benefits appertaining solely to another is in clear violation of established principles of right and contrary to the express provisions of our Constitution, Art. I, sec. 17, which forbids that any person shall be disseized of his freehold, liberties and privileges or in any manner deprived of his life, liberty or property but by the law of the land."

It would be useless to pursue the discussion further, so apt and pointed are the extracts we have made from that well-considered opinion of this Court. Here the tax was a special one, levied upon the inhabitants of a stock law district in Johnston County, in and near Smithfield Township, for the purpose of building a fence to surround said district, the same having been created under a special statute and authority also given thereby to levy the tax. It was not a tax levied under legislative authority extending to the entire county of Johnston. If the excess of the tax levy can be given to the other inhabitants of the county for their benefit, it follows that one section of the county, in this indirect way, can be taxed for the benefit of another. Admitting that the surplus of a general tax can be thus constitutionally added to the general funds or revenues of the county, it does not follow that the surplus of a special tax can be thus applied to general county purposes. Every citizen should be made to contribute his full share to the particular burden of taxation resting upon him and those similarly situated, but the State cannot, under our Constitution, or under that of any other well regulated system of government, exact more of the taxpayer. There should always be, as near as may be, an equal distribution of benefit and burden. This may be adjusted, it is true, and it has been so held, upon some equitable principle of apportionment applicable alike to all (8 Cyc., pp. 1071 and 1132), for example, by districts or area or by lineal feet, as in the case of local assessments, but in whatever way it is done it must not amount to the taking of one taxpayer's property and giving it to another, who

7—178

contributed nothing to the tax. It had might as well be accomplished directly as indirectly. Circumlocution or indirection is no justification of it. In principle and in effect, it is the same to the taxpayer as if the State should reach into his pocket and, against his consent, hand over his money to his neighbor as a gratuity. It makes little difference to the loser whether it is taken in one way or the other, if he is wrongfully or inequitably deprived of it. If the surplus of the tax collected in this stock law district cannot be returned to its taxpayers they should, at least, have the benefit of it in their own district or locality. There is no more reason for giving it to those outside the district than for giving any surplus of county taxation to this special district, which we said in the *Johnston case, supra,* could not be done.